**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| TITLE TRADING SERVICES USA, INC. | § | |
| | § | |
| Plaintiff, | § | **VERIFIED COMPLAINT AND** |
| | § | **APPLICATION FOR TEMPORARY** |
| vs. | § | **RESTRAINING ORDER AND** |
| | § | **PRELIMINARY AND PERMANENT** |
| ARINDAM KUNDU, COASTAL | § | **INJUNCTION** |
| MANAGEMENT LLC, MARC PRESTON, | § | |
| SYED SAIF ASHRAF, DEREK CHIU, and | § | |
| ELIOT T. SMITH, | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

1.     Title Trading Services USA, Inc. ("*Title Trading*," "*Title*" or "*Company*") brings this Verified Complaint and Request for Temporary Restraining Order, and Preliminary and Permanent Injunctive Relief (the "*Complaint*") alleging numerous causes of action against the above-named Defendants, particularly Title Trading's faithless fiduciary and former trusted agent, Arindam Kundu ("*Kundu*"). The claims brought herein, among other things, arise out of a scheme to misappropriate and steal Title Trading's highly confidential and proprietary trade secrets and know how.  The scheme was perpetrated by Kundu along with the other defendants (all Defendants other than Kundu are referred to collectively as the "*Non-Employee Defendants*"), including most notably Defendant Coastal Management, LLC ("*Coastal*") and its main principal, Marc Preston ("*Preston*").

# I.
## INTRODUCTION

2.     The principals of Title Trading recently received a very disturbing call from an anonymous caller that began with the following: *Anonymous Caller*: "Does Ari Kundu still work for you?"

3.     Thus was the beginning of an anonymous phone call alerting Title Trading to the fact that an enormous scheme to misappropriate Title Trading's highly confidential data, information, and trading strategies and technology was not only underway, but it had been going on for quite some time, at least since 2011. The anonymous phone caller discussed in detail the activities of Arindam (Ari) Kundu (previously defined as "*Kundu*"), being undertaken with Coastal Management LLC (previously defined as "*Coastal*") and its principal owner, Marc Preston (previously defined as "*Preston*"). The anonymous caller revealed information about the actions of Kundu, Coastal and others that only someone with actual knowledge of these activities could have.

4.     In short, Title Trading was being pillaged. It was credible and terribly shocking.

5.     After this alarming news, Title Trading conducted an internal investigation in which, through examining Company-owned computers on Company premises, Title Trading determined that Kundu, Title Trading's erstwhile trusted fiduciary, was indeed the mastermind of a massive conspiracy with participants spread out over the globe – from California to Canada, to New York, to Bangladesh. The conspiracy was designed for the sole and express purpose of engaging in a surreptitious and systematic theft of the Company's intellectual property.

6.     In summary, Kundu and his "team" were supplying copies of Title Trading's proprietary trading strategies and technology and the Coastal "team" was putting up $20,000,000 of buying power, and hosting high speed computers and tech support, all in partnership to exploit

2

for themselves Title Trading's assets. Having gathered the evidence, Title Trading confronted Kundu with its findings, and Kundu confessed to his crimes. When Kundu was asked by Title's general counsel how much in illicit profits he generated last year with Title's strategies, Kundu referenced hundreds of thousands of dollars of profit. Further, Kundu promised cooperation that he predictably has not honored.

7.　　Title Trading brings this action to salvage what it can of its existing computer codes and trading strategies, technology and other assets that have been brazenly stolen and used by the Defendants, and recoup the damages Title has sustained and/or illicit profits made from the Defendants as a result of this scheme.

**II.**
**PARTIES**

**A.　Plaintiff.**

8.　　Plaintiff Title Trading Services USA, Inc. is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.

**B.　Defendants.**

9.　　Defendant Kundu is an Indian national citizen and a temporary legal resident of North Carolina. Kundu may be served at his last known address, 4625 Piedmont Row Drive, Unit 600e, Charlotte, NC 28105.

10.　　Defendant Coastal Management LLC is a limited liability company organized under the laws of the State of New York, with its principal place of business at 40 Wall Street, 17th Floor, New York, NY 10005.

11.　　Defendant Marc Preston is an individual who may be served with process at his principal place of business at 40 Wall Street, 17th Floor, New York, NY 10005.

3

12. Defendant Syed Saif Ashraf is an individual residing at 580 Mill Creek Lane, Apt. 208, Santa Clara, California 95054, where he may be served with process.

13. Defendant Derek Chiu is an individual residing at either 144-70, 41st Avenue, Unit 4A, Flushing, New York 11355 or 16854 Powells Cove Blvd., Unit #25, Beechhurst, New York, 11357, where he may be served with process.

14. Defendant Eliot T. Smith is an individual who may be served with process at his place of business, which is 10 New King Street, Suite 106, While Plains, New York 10604.

### III.
### JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 (federal question) (as further stated in 18 U.S.C. §§ 1964(a) & 1964(c)), 1332 (diversity of citizenship) and 1367 (supplemental jurisdiction). The amounts in controversy are well in excess of $75,000.

16. This Court has personal jurisdiction over the Defendants consistent with the U. S. Constitution and N.C. Gen. Stat. § 1-75.4, for the reasons hereinafter set forth, including the facts that the Defendants (a) are present in this state either themselves or through agents; (b) regularly and actively conduct business in this state and judicial district either themselves or through agents; (c) have sufficient minimum contacts with this state; (d) have inflicted injuries in this state and judicial district; (e) have, either themselves or through agents, performed services in this state and judicial district; and/or (f) are subject to the jurisdiction of this Court. Without limiting the generality of the foregoing, personal jurisdiction exists pursuant to 28 U.S.C. § 1964, *et seq.*, given the national service of process provisions of that statute. Furthermore, personal jurisdiction exists over the Defendants because they have engaged in conduct, the effects of which were known and anticipated to be felt in North Carolina. Additionally, personal

4

jurisdiction exists over the Defendants because they have engaged in a conspiracy whose effects are not only felt in North Carolina, but acts associated with this conspiracy occurred within this state.

17.     Venue is proper in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. §§ 1391(b) as a substantial part of the events and omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of the claims herein asserted are situated in this district.

## IV.
## BACKGROUND FACTS[1]

18.     Title Trading is a financial technology and principal trading firm that, among other things, employs traders to create strategies and trade Title Trading's funds in various securities markets utilizing those strategies.   As a vital part of its business, Title hires quantitative analysts (or "quants"), traders and developers to develop various proprietary trading strategies which can be successfully implemented for Title, which strategies can include a wide range of things including for example, (a) identifying target securities and opportunities, (b) identifying predictive indicators for particular securities or transactions, (c) developing trading models, (d) constructing algorithms for trading, and (e) devising analytic tools to gather and analyze combinations of factors to be deployed in trading, among a myriad of other matters which may go into the development and refinement of a successful trading strategy.   The proprietary trading of securities is a very highly competitive business and fortunes can be made or lost depending on the success of a trading strategy.   Thus, competition is fierce for the development of successful strategies to be deployed. Title employs a number of people to research, develop, enhance, maintain, operate and deploy a variety of confidential and

---

[1]     The material factual assertions in this section IV of the Complaint, are verified by the Declaration of Title Trading's President and CEO, George Elio, filed contemporaneously herewith.

proprietary trading strategies for Title's account and spends significant sums to develop these confidential and proprietary strategies.

19.     Additionally, Title is a technology company. Title employs people with expertise in trading technology, including creating software in general and source and object code writing (and revisions thereto) in particular, as well as hardware configurations, to be used in conjunction with the deployment of Title's trading strategies.  Thus, Title will often instruct employees with expertise in technology to work with employees developing strategies, to create a more effective way of automating the trading process for the Company.  Title's proprietary trading strategies and technology are the result of very significant ongoing research and development efforts employed by Title's employees and professionals.

20.     Defendant Arindam Kundu (previously defined as "*Kundu*") is a citizen of India. Kundu was employed as a Quant Strategist/Developer for Title from July 20, 2009 through March 21 2014, when Kundu was terminated for cause.  Attached as Exhibit 1 is Kundu's Employment Agreement dated July 20, 2009 (the "*Employment Agreement*").  Title sponsored Kundu as an H-1B immigrant pursuant to United States immigration laws, which meant that legally he could work only for Title. In the context of his relationship with Title, a fiduciary relationship existed as a result of (a) a principal/agent relationship between them; and (b) as a result of a special relationship of trust and confidence that Title justly reposed in Kundu which resulted in Kundu being in a position of superiority over and influence on Title.

21.     Kundu was at all times assigned by Title to work with others within the Title organization who had developed strategies to develop the supporting technology and programing to implement or deploy those strategies. Title maintained control over Kundu's assignments, tasks, alterations of the results of his tasks, and other aspects of his work. As such, among other

6

things, Title provided Kundu constantly with Title's confidential and proprietary trading strategies and required that he learn them firsthand in order to write the code to implement, monitor, test, deploy and modify both the strategies and the technologies that utilized those strategies.

22. Given the extremely sensitive nature of his work for the Company, Kundu was required to execute the Employment Agreement in which, among other things, he both agreed and was obligated to:

a. work exclusively for the Company until final termination, which included without limitation, a preclusion to form any other entity or business, particularly one which competed with the Company and wrongfully used its assets and properties;

b. not use any of the Company's trading strategies or use any information learned from or in connection with any of the Company's trading strategies (either during his employment or thereafter), except while employed, and then only for the benefit of the Company, which included an obligation in particular not to individually or in conjunction with others, secretly "mirror" trades in securities made by the Company;

c. not use any of the Company's technology or use any information learned from or derived in connection with any of the Company's technology (either during his employment or thereafter), except while employed, and then only for the benefit of the Company;

d. not engage in securities trading except for the Company (with certain very narrow limitations, not relevant);

e. not reveal trade secret and confidential information to anyone, including without limitation, any of the Company's strategies or technology;

f. not use any trade secret and confidential information, including without limitation, any of the Company's strategies or technology, except only for the benefit of the Company;

g. bring all business opportunities, prospects and possibilities to the Company and not exploit them himself and/or with others;

h. grant the Company all right, title and interest in and to all work product and other deliverables made during and/or resulting from Kundu's Services, including without limitation, in connection with all concepts, methodologies,

source codes, object codes, algorithms, discoveries, and other such items delineated in Kundu's Employment Agreements as well as all strategies and technologies he may have developed either alone or in conjunction with others;

i. not allow or permit any one, and certainly not assist others, in creating any derivative works based on or related to any of the Company's intellectual property or assets;

j. after employment terminated,

(i) return all Company property, including without limitation all strategies and technology, as well as computer code, software, and other tangible and intangible assets to the Company, and

(ii) not misappropriate trade secrets, Company Property, Trading Strategies, Customer Information, Developments, Systems, and Confidential Information belonging to the Company including without limitation, any of the Company's strategies or technology.

23. Kundu was originally employed in 2009 and assigned over the years various strategy development tasks for the Company. Ultimately Kundu was assigned by Title to develop and enhance an existing trading strategy which the Company had given the code name "RefArb", with help and expertise of Title's Head of Trading Services, Seif El Kilany ("_SEK_"). SEK (a) was a subject matter expert on market structure, (b) had knowledge of the RefArb strategy while employed by the Company and (c) was working for the Company to help quants within Title develop and enhance the particular trading strategy (herein called the "_RefArb Trading Strategy_" The RefArb Trading Strategy is one that the Company has been working on and investing money to develop and perfect for many years. In fact, Title has invested well over $1,000,000 in researching, developing, testing, deploying and reconfiguring the RefArb Trading Strategy over a long period of time.

24. The trading strategy, which Title considers to be its trade secret, involves trading "opening and closing orders" regarding "imbalances" which may exist on various exchanges. An "opening and closing order" is a situation when an exchange pairs off opening orders and

closing orders to determine an opening print or closing print.  It is not uncommon, for example, to have 2000 or more stocks for which an opening price or closing price imbalance exists (called "*symbols*") that will be the subject of the RefArb trading strategy as well as certain information about those symbols.  The RefArb Trading Strategy involves essentially a multi-step process. Initially, data is disseminated by the exchanges about the different "symbols" on which an imbalance exists.  This data is filtered through algorithms of Title, the result of which is to produce a variety of rankings of these symbols to dramatically narrow down the pool from a large number of potential symbols to a much smaller, more manageable number. Next, once the algorithms generate the unique, reduced number of symbols that are eligible under Title's proprietary guidelines to be traded, the RefArb Trading Strategy applies an additional, further proprietary process which reviews and compares the symbols within the reduced RefArb against risk and exposure parameters which are programmed into the RefArb Trading Strategy and applies a proprietary "weighting" and "sizing" to each symbol to further narrow the list of acceptable trade candidates down for trading, which candidates Title does in fact trade.  These processes involve comparing a large number of factors regarding not only the various symbols but other market related statistics, all of which are part of the overall RefArb Trading Strategy.

25.     Of particular importance in the RefArb Trading Strategies are the rules embodied in the algorithms of the data to be analyzed and the configurations of that data to reflect symbols that are attractive for trading throughout the process.  The candidate symbols are also given "scores" to reflect their attractiveness in relation to the other eligible symbols, which are re-computed within certain windows of time.  These confidential pieces are all part of the overall trade secret process embodied in the RefArb Trading Strategies.

26.     In summary, in all of Title's various steps, the strategy has a large number of proprietary scoring configurations to determine (a) symbols that eligible under the strategy to be traded, (b) time intervals in which the scoring is re-computed to determine changes to the decisions initially made, (c) when the symbols will be traded depending on the continued monitoring of scores and rankings and their relative changes in relation to other market data (such as the directional movements of various market related data), and (d) an automatic execution system that places orders for the strategy if the pre-set parameters which are a part of the system are otherwise met at certain precise times in the day as the orders are winding down. These various components of the RefArb Trading Strategies essentially dictate the symbols to be traded, in what volumes, at what prices, and the hold periods before sale.   These strategies are employed on the daily market open and closes as well as on the semi-annual "rebalance days" which the exchanges refer to as "Stock Market Index Restructuring" days.

27.     Kundu's Employment Agreement specifically identified and defined the term "Trading Strategies" as "…any and all algorithms, trading strategies (whether developed in-house or observed by monitoring or communicating with the Company's or it's Affiliates' traders anywhere situated) and grey and black box computer assisted trading programs." Furthermore, the Employment Agreement clearly and specifically defined these Trading Strategies as the Company's "Confidential Information," which Kundu specifically agreed to.

28.     Kundu was assigned to help SEK enhance the existing RefArb strategy.   This, in turn, required SEK to sit with Kundu and explain the components of the RefArb Trading Strategy, including the various factors and "rules" that the RefArb Trading Strategy employed, so that Kundu could write the source codes and programs to automate the processes involved in implementing the strategies, as referenced above. The process was iterative, as most if not all of

the rules and parameters of the RefArb Trading Strategy were required to be distilled down into computer executable code. For purposes hereof, the software developed to implement the RefArb Trading Strategy, as it evolved is herein called the "*Implementing Software*."

29. After the Implementing Software was created, Kundu was also tasked by Title with writing confidential and proprietary code to actually execute the transactions that were thus the subject of the RefArb Trading Strategy and the Implementing Software (the "*Execution Software*").

30. In summary, Kundu's responsibilities required him, as instructed and overseen by Title and its other agents, to (a) gain an intimate familiarity with the RefArb Trading Strategy, (b) work to create technology what would embody, enable and facilitate that strategy (herein previously defined as the "*Implementing Software*"), and then (c) create technology to make securities executions based on that strategy (herein previously defined as the "*Execution Software*"). The RefArb Trading Strategy, the Implementing Software and the Execution Software, including their individual components/functions as well as the total compilation, constitute the Company's trade secrets.

31. The Employment Agreement explicitly defined Confidential Information – which belonged exclusively to Title – to include:

> "all technical and business (including Business) information, including drawings, know-how, improvements, software, programs, object code, source code, development tools, software source documents, techniques, data, specifications, (including functional, design and technical specifications), documentation or other technical or business information in any form"

as well as Developments, defined to mean

> "…any and all concepts, methodologies, computer programs, computer software, source code, object code, algorithms, grey and black box computer assisted programs, firmware, microcode, compilers, interfaces, object-oriented code and other codes and forms of software, know-how, drawings, suggestions, discoveries, processes products, trade secrets, processes, material, products, services,

Case 3:14-cv-00225-RJC-DCK   Document 1   Filed 04/29/14   Page 11 of 46

discoveries, inventions, and improvements, which [Kundu] may make solely, jointly or in common with other employees or Persons, during the term of [Kundu's] employment with Company which relate directly or indirectly to the Business or commercial activities of Company or its Affiliates."

32.     Indeed Kundu and SEK, as well as others at the Company who were working on the project, worked at Company direction and expense many, many long hours seeking to take the RefArb Trading Strategy, model it, adjust it, test it, deploy it, and then adjust it again, all in a continuous process as overseen and directed by the Company's executive officers.  As a result of this, not only did Kundu write the Implementing Software that embodied and contained the RefArb Trading Strategy, and the Execution Software to accomplish the executions based thereon, he became sufficiently proficient that he could and did make substantive contributions to the strategy itself all, however, being for the benefit of the Company.

33.     The research and development to create, test and deploy, and make ongoing adjustments to, the above-referenced proprietary strategies and technologies (including the RefArb Trading Strategy, the Implementing Software, and the Execution Software) depended almost entirely on a large body of confidential information not available to the public or anyone outside of Title.  The strategies and technology referred to above (including the RefArb Trading Strategy, the Implementing Software, and the Execution Software) developed by Title have taken many years and a very significant financial commitment to develop.  Further, this large body of confidential information (including the RefArb Trading Strategy, the Implementing Software, and the Execution Software) provides Title with a significant advantage over its competitors, who would be given an enormous advantage if they could gain access to them without having to incur the time and expense themselves to develop.  If Title's confidential and proprietary strategies and technologies were to fall into the hands of competitors, those persons could use and/or modify such information to identify the same valuable trading opportunities currently

being identified and worked by Title, and usurp those opportunities to unjustly enrich themselves. In fact, many strategies and technologies at issue in this case would be rendered less valuable if others were using them at the same time, given the particular functions of these strategies, which are liquidity sensitive.

34.     With respect to all strategies and technologies relevant in this case (including the RefArb Trading Strategy, the Implementing Software, and the Execution Software), Title takes more than reasonable steps to guard their secrecy. These steps include, but are not limited to, making a condition of employment that all employees with access to trading strategies and technologies execute written agreements agreeing, among other things to significant conditions and restrictions on use, protection and disclosure. Furthermore, access to these items is password protected such that other employees not involved cannot access these items without permission.

35.     Unknown to the Company at that time, Kundu was getting deeper into personal debt and was seeking ways to financially capitalize on the information and knowledge that he was garnering from his employment with the Company. Motivated by this, and plain greed, from the records that the Company has been able to recover, it is now clear that Kundu first secretly put into place a programing group, consisting of, among others, various programmers and software developers, one of whom was Mutawaqqil Billah ("_Billah_"), who were given copies of Title's code, and thus the strategies they embodied, that Kundu had written exclusively for Title. Kundu and the others continued to make programming changes to Title's code to deploy for the Defendants themselves the strategies and the technology that Kundu was developing while working on for the Company, albeit secretly.

36.     In order to finance this illicit activity, Kundu needed financial support and approached Defendant Syed Saif Ashraf ("*Ashraf*"), who was an executive at Google. Defendant Ashraf's role was to not only provide the operating capital, but to purchase and manage assets, such as computer servers, on which the Company's illicitly obtained strategies and technologies could be housed, altered, tested and deployed for these conspirators. At all times Defendant Ashraf knew that Kundu was an employee of Title Trading with duties imposed on him from both a contractual and common law basis. Moreover, Kundu's status as an H-1B nonimmigrant precluded him from working with anyone but Title. In furtherance of this scheme and to better implement it, Defendants Kundu and Ashraf, and other of the Defendants, on information and belief, based on records from Kundu's Company-owned computer, formed an entity, namely Karma Technologies, Ltd. ("*Karma*"). Other known members/owners of Karma were Defendants Derek Chiu ("*Chiu*"), Eliot Smith ("*Smith*") and Billah. Kundu, Ashraf, Billah, Chiu, Smith and their entity, Karma, are herein sometimes collectively called the "*Karma Defendants*."

37.     While Kundu continued working with SEK for the Company – creating the appearance of being an honest, faithful agent – he was befriending other traders to gain access to Title's strategies. Behind this façade, however, the Karma Defendants were secretly (a) taking the RefArb Trading Strategies and technologies created to utilize them back to the Karma Defendants, (b) deploying and using them for their own gain, and (c) making technological improvements, advances, and derivative works for their own benefit, all without disclosing same to Title Trading.

38.     In video footage which Title Trading has been able to salvage from the Company computer system used by Kundu, Kundu, Ashraf and Billah actually taped themselves and some of their clandestine meetings over extended periods of time. They can be seen exchanging and

modifying computer code, which the Company has positively identified as belonging to Title Trading, given the structure and revealed content, among other things. Furthermore, within Title Trading, certain internally generated terms or phrases were used for shorthand reference to the trading strategies to which they related – much like a "code name." Notably, these names and terms are sufficiently unique in that they were not "street terms" that would be used in the vernacular. The video footage obtained by Title Trading in its investigation showed Kundu and Billah using these names and terms to describe the purpose and function of their illicit activity, further showing the theft they were engaged in.

39. The Karma Defendants also needed to bring in a partner or partners, to provide a vehicle through which the RefArb Trading Strategy and other strategies and technology they had illicitly obtained from the Company and had covertly been working with, could be actually deployed into the financial markets on a large scale and profits derived therefrom. In order to accomplish this, they contacted Defendant Marc Preston (previously defined as "*Preston*") and Coastal Management, LLC (previously defined as "*Coastal*"), to partner with them in the hosting and execution of the RefArb Trading Strategy for themselves. Preston and Coastal are collectively herein sometimes called the "*Coastal Defendants*."

40. Preston, acting through Coastal, was approached about providing – and ultimately agreed to provide – computer support, technological support, and significant buying power for the illicit activities of the Karma Defendants. As a business engaged in proprietary securities trading, Coastal knew that it can engage in the trading business through (a) hiring employees who are proprietary traders for their company; (b) entering into a partnership (or joint venture) with third parties; or (c) serving as a facilitator through whom securities trades are executed. On information and belief, Coastal is not a licensed broker-dealer, and thus it could not have

been serving as a broker in their dealings with the Karma Defendants. Further, there is no way that the relationship could have been employer/employee as the Coastal Defendants were dealing not with one person, but with a group of people: the Karma Defendants. The only plausible relationship that could have been entered is that of partner, where there were division of profits, division of losses and expenses, joint management and decision making.

41.     It is not possible that the Coastal Defendants would have expended significant technology and trading support and most importantly of all put $20,000,000 of buying power at the disposal of the Karma Defendants, without having conducted significant due diligence into the members of the Karma Defendants as well as into their strategies and technology for which the Coastal Defendants would both be at risk for losses and from which the Coastal Defendants would receive profits. In fact, to have committed Coastal to this significant financial exposure particularly created by allocating this type of buying power to the Karma Defendants' strategies and technologies without massive due diligence on the part of the Coastal Defendants would have been financial suicide.

42.     The Coastal Defendants, on information and belief based on the foregoing, therefore undertook extensive due diligence before committing the capital and manpower to partner with the Karma Defendants. During this time of due diligence by the Coastal Defendants, they would of necessity have learned and thus would have known, among other things, that (a) Kundu was a quant strategist and programmer, not a seasoned trader; (b) Kundu was working in the United States under an H-1B visa which required a United States company's sponsorship as an employer and restricted work to work for that employer; and (c) given their own trading expertise and normal due diligence protocols, that Kundu had not developed the trading strategies he was bringing to the partnership with the Coastal Defendants but had acquired them

from detailed observation from other sources, the only plausible source of which was Kundu's then current employer – Title Trading. These facts were unavoidable conclusions that the Coastal Defendants must have known, as in the industry, seasoned traders are rarely if ever programmers and vice versa and anyone even marginally skilled in the business would be able to see that Kundu was a quant/programmer not a trader. Kundu's immigrant status in the United States of necessity must have come up in the due diligence review, which in turn would have elicited the information that Kundu was here working as a programmer for another securities trading firm, from which, in turn, it would have been obvious that this was the source of the knowledge of Kundu's trading strategies.

43.     After being satisfied through its vetting process of the Karma Defendants, the Coastal Defendants set about wholeheartedly committing themselves to the scheme. By way of example only, the following are emails retrieved from the Company computer entrusted to Kundu per the Employment Agreement, from emails in his inbox (and thus to which he was a party) which provide a window into the conspiracy and illustrate the knowledge possessed by all Defendants as well as their illicit actions:

    a.  by email dated April 12, 2011 Defendant Eliot Smith proposed the formation of an entity for the purpose of for the purpose of exploiting the assets of Title Trading. As revealed in this email exchange, (a) the organizational structure for the Karma Defendants was set forth (Defendant Smith was designated as responsible for "legal and accounting duties"; Defendant Chiu was to be the "chief technologist;" and Defendant Kundu as a founder and primary driving force was responsible for the basic strategies whose interests are stated to be held by Kundu's sister as a nominal placeholder for him ["Ari will be replaced with Natasha Kundu in every contract."]), (b) the profit sharing percentages among the members of the Karma Defendants were agreed to; and (c) the Karma Defendants were already operating in conjunction with the Coastal Defendants;

    b.  by confidential internal communication, SEK had circulated to the principals of Title Trading as well as Defendant Kundu as an agent of Title a trading report showing very specific and confidential information regarding the results of the RefArb Trading Strategy that had been employed in a particular context. Kundu forwarded this confidential internal Title email which Kundu received as an agent

17

of Title to his confederates within the Karma Defendants and Defendants Preston and Coastal saying, "Guys this is what we can do next Friday. Let's push to get imbalance live." This is an explicit use of the wires transmitting confidential information to all of the Defendants (a) showing internal and confidential Title Trading documents, (b) making it clear that the Defendants were knowingly and intentionally exploiting Title's strategies with one of Title's existing agents, and (c) exhorting the other conspirators to utilize this strategy for their own profits as soon as they could;

c.  by email dated August 7, 2012, Mark Preston and Sasha Szabo, principals of Coastal, communicated with members of the Karma Defendants about (a) the "need to get the 50/50 arrangement in writing";  (b)  there would be not only sharing of profits but also sharing of losses; (c) the importance of getting the "risk metrics" worked out regarding potential trading parameters to be jointly engaged in losses;  (d) the long-term plan of the Coastal Group ("The plan is to incubate you in our JBO and if all goes well we will flip you into our fund structure and return your 10k.");

d.  by email dated December 21, 2012, with a subject line that read "We should look at why it underperformed at Coastal" Defendant Kundu sent to members of the Karma Defendants and Coastal Defendants confidential and proprietary profit and loss statements which Kundu had received from Title Trading showing Title's results of trading the RefArb Trading Strategies. The subject line of the email says:  "We should look at why it underperformed at Coastal," demonstrating that all of the Defendants were not only knowingly utilizing the Title Trading strategies but frustrated at not achieving as good results as Title had. By email dated the same day, Mark Preston for the Coastal Defendants promptly responded "please let me know" indicating that he too couldn't understand why deploying the same RefArb Trading Strategy they had stolen did not produce quite the same results for them as it had for Title Trading;

e.  by email communication dated March 1, 2013, Defendant Kundu sent to both Mark Preston on behalf of the Coastal Defendants as well as Defendant Ashraf on behalf of the Karma Defendants, specific screenshots showing actual results of trading the RefArb Trading Strategy by Title Trading itself, which Kundu received as an agent of Title, further validating the fact that all Defendants were absolutely not only aware of the fact that they were stealing Title Trading's information, it was the entire basis of their venture;

f.  by email dated March 20, 2013, Mark Preston on behalf of the Coastal Defendants asked Kundu and Chiu on behalf of the Karma Defendants why they were not more aggressively trading. The Coastal Defendants had provided a massive $20,000,000 buying power as a part of their contribution to the illicit partnership. Yet, as this email demonstrates, trading was not occurring as aggressively as the Coastal Defendants had hoped. This indicates, however, the trading had in fact occurred and was ongoing at this time utilizing the RefArb Trading Strategy which belonged to Title Trading;

g.    by email dated August 1, 2013, SEK transmitted to the owners of Title Trading confidential trading results from the RefArb Trading Strategies which Kundu received as an agent of Title. Kundu then took this email transmitting significant, confidential trading data and information as well as results of trades intended for internal use at Title, and forwarded it to his own personal email account, and then forwarded it out to other members of the Karma Defendants and Coastal Defendants. In fact, the last line on that forwarded email which Kundu received as an agent of Title, expressly states:

> "**The information contained in this e-mail and all attachments is confidential and is for the sole use of its intended recipient [here the owners of Title Trading]. It may not be disclosed to or used by anyone other than the addressee.**"

Hence there is no question that the Defendants know they were receiving and dealing in Title's confidential information;

h.    by email dated approximately January 15 or 16, 2014, Chiu of the Karma Defendants sent an email to "All" noting that there were problems with the "spryware" being loaded for purposes of the conspiracy onto Coastal computers (spryware being a low latency real-time market data feeder for trading which is loaded on the server that is to do actual trading);

i.    by email dated around January 15 or 16, 2014, Defendant Preston gave the contact information of Coastal's Max Reynoso to the Karma Defendants. Coastal's Reynoso is stated on other screen shots obtained from the Company computer used by Kundu, to be Coastal's tech and trade support person, and thus the correct person to contact about problems with loading and running the spryware (data supply source) onto Coastal servers;

j.    by email dated around January 15 or 16, 2014, Coastal's head of tech and trade support, Max Reynoso, wrote to Kundu stating in part: "Ari, Marc mentioned that you had some issues with your Spryware connection…" then went on to discuss this. There would have been need for this conversation but for the partnership and Coastal servers being used for the conspiracy's trading activities;

k.    by email dated January 17, 2014, Coastal's head of tech and trade support Max Reynoso again wrote to Kundu and Chiu of the Karma Defendants that Coastal had been required to "redeploy a new Windows VM for you [i.e., the Karma Defendants] in Jersey City." Reynoso went on to ask that the Karma Defendants reinstall necessary software on these new servers. Obviously, Coastal in its partnership with the Karma Defendants was/is supplying the servers and tech support necessary to accomplish the illicit trading using Title Trading's purloined strategies and technology;

l.    by email dated January 17, 2014, the Karma Defendants wrote to "Craig" who was/is Craig Roberson, Coastal's trading operations person designated to the Karma Defendants' project, reflecting previous telephone conferences and stating that the Karma Defendants would not be trading on the Coastal servers that day, as reinstallation of software was required; and

m.  by email dated January 18, 2014 at 12:47 pm Chiu specifically discussed re-setting up the "Coastal Server" on the night of January 18 or the next day.

44.  The communications and emails referenced above and in other portions of this Complaint, were interstate wire communications made for the purpose of executing the fraudulent scheme referenced in this Complaint.  The email referenced in paragraph 44(l) references telephone calls, which involved the use of interstate wires.  The references in the emails above are to trading activity that involves the use of the interstate wires to wire both orders and money flow across interstate wires.  The videos referenced above involve interstate wire communications.  Kundu himself has sent literally tens of thousands of emails and wire communications regarding the matters that are the subject of this Complaint, all using the wires.  All of the foregoing are acts indictable under, among other things, 18 U.S.C. §§ 1341 & 1343 and they were made for the purpose of executing the fraudulent scheme referenced in this Complaint.

45.  The trading that was taking place by the Defendants as a collective group was without question utilizing the strategies developed by Title Trading, including the RefArb Trading Strategy, to which Kundu had been entrusted, as well as the Implementing Software and the Execution Software, as the above referenced emails and the screen shots retrieved from the Company computer entrusted to Kundu demonstrate. In fact, the above emails demonstrate the transmission of Title's trading results from the RefArb Trading Strategies under the subject line: "We should look at why it underperformed at Coastal."  Furthermore, one of the screen shots sets forth check lists for "full day settings" as well as "half day settings," and this "check list" uses terminology – "RefArbMasterStrategy" – which is the precise strategy and even strategy name, employed by Title Trading, on which Kundu was then working with Title and SEK. Furthermore, the pictures of the stocks being transmitted back and forth among the Defendants

were the very stocks that Title was trading with the RefArb Trading Strategy – and the fact that these screen shots were sent demonstrates the same strategy was being deployed by the Defendants as otherwise these screen shots would have no relevance.

46. Hence, without question, these actions involved, among a host of other things, the improper exercise of the agency duties for which Kundu was responsible and clear and concerted action in order to undermine Title's success as well as to give his own confederates improper access to Title's confidential trade secrets. In so doing, Title was subjugated to the improper influences or domination of Kundu. Kundu was only able to accomplish this because of the considerable trust and confidence reposed in him by Title and the power to act that Title had afforded him as a result of that confidence.

47. As referenced above, the entire conspiracy came to light as a result of an anonymous phone call received by the CEO of Title Trading. The anonymous caller (the "*Anonymous Caller*") among other things identified that he had known Defendant Kundu from an effort the Anonymous Caller had made to try to work a deal out with Kundu similar to the deal with the Coastal Defendants sometime prior. The Anonymous Caller was very clear that Kundu was working with Coastal and using the strategies and technologies that belonged to Title Trading. In fact, the Anonymous Caller stated, unprompted:

> "He is working for other firms right now with your algorithms . . . Coastal being one of the firms."

48. Coastal's involvement in conspiracy with the Karma Defendants was reiterated by the Anonymous Caller on several occasions. Furthermore, the Anonymous Caller was very specific with the types of strategies that were being employed by the Defendants, using concepts and terminology which made it very clear that it was Title Trading's strategies and technology that were being utilized by the Defendants. Because of the contractual arrangements which

Kundu had with the Company, any strategies and/or any technologies developed by Kundu would belong to the Company, specifically including the RefArb Trading Strategy which Kundu was assigned to work with SEK on, as well as the Implementing Software and the Execution Software. Thus Kundu's outright theft of Company property and sharing of confidential information was a breach of contractual and statutory duties as well as illegal theft of Company trade secrets.

49. After having been advised of Kundu's gross infidelities, the Company accessed a Company computer, which had been entrusted to Kundu, pursuant to its contractual rights with Kundu under the Employment Agreement to inspect all Company property and systems, and was able to extract incriminating emails and videos as referenced hereinabove. Kundu was then summoned to the Company office, admitted to the theft of Company trading strategies and after being confronted with the evidence that had been amassed, and was then terminated for cause.

50. With his massive infidelities unmasked, Kundu confessed acknowledging that he had "crossed the line." He acknowledged that he had taken Title Trading's code, including the RefArb Trading Strategy, and not only used it but modified it and deployed it in a business which made significant profits. In addition to Defendants making significant profits from the RefArb Trading Strategy owned by Company, because the RefArb Trading Strategy is liquidity sensitive (i.e., Company and Defendants were trying to execute the same trades, which were limited by volume), the Company's profits were proportionately reduced by Defendant's gains. Defendants in essence stole from Company's trading profits by having illegal access to the RefArb Trading Strategy.

51. Attempting to explain his conduct as the result of "accumulated debts" that he had, Kundu acknowledged his mistakes, admitted to stealing Company intellectual property and

trading strategies, and pledged cooperation.  Shortly after the confrontation, however, Kundu's pledged "cooperation" never materialized.

## V.
## CAUSES OF ACTION

### A.  Breach of Contract

52.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

53.     Valid and enforceable contracts existed between Title Trading and Defendant Kundu.  All conditions precedent to Title Trading's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.  By engaging in the acts described in this Complaint, Kundu breached his contracts.

54.     Without limiting the generality of the foregoing, Kundu, whether by contract, by law, or by the duties imposed by the Employment Agreement, Employee Handbook or all of the foregoing, was obligated to:

> a.   work exclusively for the Company until final termination, which included without limitation, a preclusion to form any other entity or business, particularly one which competed with the Company and wrongfully used Company's assets and properties;
>
> b.   not use any of the Company's trading strategies or use any information learned from or in connection with any of the Company's trading strategies (either during his employment or thereafter), except while employed, and then only for the benefit of the Company, which included an obligation in particular not to individually or in conjunction with others, secretly "mirror" trades in securities made by the Company by stealing Company's Trading Strategies and running them in a competing parallel business;
>
> c.   not engage in securities trading except for the Company (with certain very narrow limitations, not relevant);
>
> d.   not reveal trade secrets and confidential information to anyone, including without limitation, any of the Defendants;

e.   not use, disclose or publish any trade secrets and confidential information but rather keep all such information confidential and use only for the benefit of the Company;

f.   bring all business opportunities, prospects and possibilities to the Company and not exploit them himself or with others;

g.   grant to the Company all right, title and interest in and to all work product and other deliverables made during and/or resulting from Kundu's services, including without limitation, all concepts, methodologies, source codes, object codes, algorithms, discoveries, and other such items delineated in Kundu's Employment Agreement and other agreements;

h.   not allow or permit anyone, and certainly not assist others, in creating any derivative works based on or related to any of the Company's intellectual property or assets;

i.   after employment terminated,

   (i)   return all Company Property, including without limitation all Trading Strategies, Developments, Systems, Confidential Information, computer code, software, and other tangible and intangible assets to the Company, and
   (ii)  not misappropriate trade secret and confidential information belonging to the Company.

55.   Kundu violated each and every one of these duties, and did so on multiple occasions and further did so since as early as 2011 while employed by the Company.

56.   As a direct and proximate result of the foregoing actions, Title Trading has suffered, and will continue to suffer, damages.  Because of these actions, Title Trading has been required to retain counsel to prosecute its claims. Title Trading has agreed to pay its counsel for the reasonable attorneys' fees and expenses incurred on Title Trading's behalf in this lawsuit.

**B. Tortious Interference with Contract**

57.   Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

58.   Kundu, whom the Non-Employee Defendants have entered into agreements with, had contracts with the Company, which the Non-Employee Defendants knew of or should have

known.  Among other things, Kundu, whether by contract, by law, or by the duties imposed by the Employment Agreement, or all of the foregoing, was obligated to perform certain duties, as herein outlined.  In violation of those duties, Kundu did one or more of the following:

    a.   failed to work exclusively for the Company until final termination, including without limitation, the fact that he formed entities or businesses, formally or informally, particularly ones which competed with the Company and wrongfully used its assets and properties;

    b.   used the Company's trading strategies and information learned from or in connection with any of the Company's trading strategies, including the RefArb Trading Strategy, while employed for the benefit of himself and the Non-Employee Defendants, and in particular secretly "mirrored" trades in securities made by the Company;

    c.   engaged in securities trading for the benefit of himself and the Non-Employee Defendants to the detriment of the Company;

    d.   revealed trade secret and confidential information to others, including without limitation, the Non-Employee Defendants;

    e.   used, disclosed and/or published trade secret and confidential information for himself and others, including without limitation the Non-Employee Defendants;

    f.   failed to bring all business opportunities, prospects and possibilities to the Company but rather exploited them himself and with others including the Non-Employee Defendants;

    g.   failed to grant to the Company all right, title and interest in and to all work product and other deliverables made during and/or resulting from Kundu's services, including without limitation, all concepts, methodologies, source codes, object codes, algorithms, discoveries, and other such items delineated in Kundu's agreements;

    h.   allowed and permitted others, and in fact assisted others, including the Non-Employee Defendants, to create derivative works based on or related to the Company's intellectual property and assets, including the RefArb Trading Strategy;

    i.   after employment terminated, (a) failed to return all Company property, including without limitation all computer code, software, and other tangible and intangible assets to the Company, and (b) misappropriated trade secret and confidential information belonging to the Company, all with the knowing assistance of the Non-Employee Defendants.

59.     All of the foregoing was conducted not only with the knowledge, agreement and assistance of the Non-Employee Defendants, those Defendants were responsible for such actions and benefited therefrom.

60.     The Non-Employee Defendants have intentionally interfered with the contracts and contractual obligations owed by Kundu solely to the Company, as outlined above.

61.     As a direct and proximate result of these actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

### C.  Interference with Prospective Economic Advantage.

62.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

63.     The Non-Employee Defendants' actions constitute interference with Title Trading's prospective economic advantage.

64.     As a direct and proximate result of these actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

### D.  Misappropriation of Title Trading's Trade Secrets and Confidential and Proprietary Information.

65.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

66.     The Defendants have misappropriated Title Trading's trade secrets and confidential and proprietary information.  In particular, the Defendants misappropriated the trade secret and confidential and proprietary information, including the RefArb Trading Strategy, the Implementing Software and the Executive Software, which contained a compilation of information that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who

can obtain economic value from its disclosure or use; and (b) was the subject of efforts that are reasonable under the circumstances to maintain secrecy. Title Trading has been damaged by this conduct.

67. Defendants' conduct constitutes the misappropriation and threatened misappropriation of Title Trading's trade secrets and has and will proximately cause damage to Title Trading for which it is entitled to recover pursuant to the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 through 157, and the common law.

68. The Defendants are liable to Title Trading for such conduct, including actual loss to Title Trading, as well as the unjust enrichment conferred upon Defendants in using the trade secret and confidential and proprietary information. Without limiting the generality of the foregoing, Title Trading is entitled to recover from the Defendants all facets of profits received by the Defendants generated, directly or indirectly from the use of Title Trading's trade secret and confidential and proprietary information, including without limitation, any and all facets of profit experienced by the Defendants.

69. Defendants' conduct is wrongful, willful and malicious. Accordingly, Title Trading is entitled to recover from Defendants punitive damages, in addition to its actual damages and attorney's fees, pursuant to applicable statutes.

70. In addition to its recovery of monetary damages and because their actions have and will cause irreparable injury, Title Trading is entitled to have Defendants' misappropriation, disclosure and use of Title Trading's trade secrets enjoined by this Court; all such trade secrets, in tangible form, returned to Title Trading; and all documents and things created from Title Trading's trade secrets destroyed.

### E. Breach of Fiduciary Duty.

27

71.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

72.     Kundu was the agent of Title Trading entrusted with duties and responsibilities to the Company.  He was a fiduciary of the Company.  Among other things, he owed duties to the Company of the utmost loyalty, honesty, integrity, candor and good faith per the Employment Agreement and laws.  All of these duties have been violated by the actions herein complained of. The Non-Employee Defendants knowingly and intentionally participated in the breach of these fiduciary duties for their financial gain.  As such the Defendants are jointly and severally liable for such breaches of fiduciary duty.

73.     As a direct and proximate result of these actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

74.     Title Trading has been damaged by this conduct and the Defendants are liable to Title Trading for such conduct, including actual loss to Title Trading, as well as the unjust enrichment conferred upon Defendants in using the trade secret and confidential and proprietary information. Without limiting the generality of the foregoing, Title Trading is entitled to recover from the Defendants all facets of profits received by the Defendants generated, directly or indirectly from the use of Title Trading's trade secret and confidential and proprietary information, including from the RefArb Trading Strategy, Implementing Software and Executive Software.   Additionally, Title Trading is entitled to recover disgorgement and fee forfeiture of any fees charge by any of the Defendants to their illicit venture.

**F.  Conversion and Theft.**

75.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

76.     The Defendants have unlawfully and wrongfully taken and/or maintained possession of personal property that rightfully belongs to Title Trading.  Without limiting the generality of the foregoing, the Defendants have taken, knowingly participated in the taking of, knowingly received for their own financial benefit, misappropriated, and/or retained, confidential, proprietary or trade secret information belonging to Title Trading, for the purpose of furthering their own business.

77.     Title Trading did not consent to the foregoing and was harmed by the acts as described herein.  The Defendants are liable to Title Trading for such improper conversion and expropriation, including for restitution of the value of the confidential, proprietary or trade secret information and other materials received by the Defendants, measured as the benefit conferred to the Defendants, which should be disgorged.

78.     As a direct and proximate result of the Defendants' actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

### G.  Fraud by Omission/Constructive Fraud.

79.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

80.     Kundu held a position at Title Trading of trust and confidence, had access to and was entrusted with a great deal of Title Trading's confidential materials, and acted as Title Trading's employee in the completion of his work.

81.     Kundu had one or more business opportunities, including without limitation, in the form of a venture among himself and the Non-Employee Defendants, pursuant to which they were using and developing algorithms to be used to trade which belonged to Title Trading, and

derivatives thereof based upon Title Trading's property. Kundu had a legal duty as well as a contractual duty to disclose these opportunities to Title Trading.

82. Kundu did not inform Title Trading of any business ventures and instead both maintained his silence, and usurped them for himself. The Non-Employee Defendants knowingly and intentionally participated in these actions (or more appropriately, inaction). As such the Defendants are jointly and severally liable for such misconduct. As a result Title Trading continued to pay Kundu in part for his continuing loyalty, and was injured by the fact that Kundu was not loyal to Title Trading for an extended period of time prior to the termination of his employment despite continual payments to Kundu.

83. As a direct and proximate result of the Defendants' actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

## H. Conspiracy.

84. Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

85. Each of the Defendants has joined together for the purpose of accomplishing the acts herein above identified. Each Defendant has knowingly and intentionally joined the conspiracy, for the express purpose of seeing it succeed. Furthermore, each of the Defendants has knowingly rendered aid and assistance to the wrongful acts of others with a view towards seeing the wrongful acts accomplished. Without limiting the generality of the foregoing, the Defendants joined together for the purpose of inducing, causing, actively participating in, and personally benefiting from, misappropriation of Title Trading's confidential, proprietary or trade secret information, tortious interference with contract, breach of fiduciary duty, conversion, and the other acts herein complained of. Each Defendant was under a duty not to accomplish or

participate in any of these and each was acting for their own advantage and benefit in connection with the conspiracy. Title Trading has been damaged by the acts of the Defendants undertaken as a part of the conspiracy herein alleged.

86. As a direct and proximate result of the Defendants' actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

### I. Violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Acts (Federal and State).

87. Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

88. This cause of action asserts claims under both the federal racketeering statute, §§ 1962 (a), (c) and (d) (the "*Federal RICO Statute*"), as well as under the North Carolina state version of the federal racketeering statute, codified in N.C. Gen.Stat. § 75D–1 et seq. (the "*State RICO Statute*"). The Federal RICO Statute and the State RICO Statute are herein sometimes collectively called the "*RICO Statutes*."

89. All the Defendants (the "*RICO Defendants*") have associated themselves with enterprises engaged in and affecting interstate commerce, and have directly or indirectly participated there in through engaging in a continuous pattern of racketeering activities, predicated on violations that include, but are not limited to, 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Additionally, one or more of these acts, among other things, violate N.C. GEN. STAT. § 14-75.1 (2001) as well as N.C. Gen.Stat. § 14–90 (1993). In so doing, they have violated 18 U.S.C. § 1962 (a), (c) and (d) of the Federal RICO Statute and § 75D–4 of the State RICO Statute.

31

90. Specifically, since the outset of their relationship which is known to have started at least in early 2011 if not earlier, and is continuing even through the date hereof, the RICO Defendants consistently used the mails, wires and other electronic means to conduct, further and carry out their scheme to defraud Title Trading and to misappropriate Title Trading's confidential information. This includes but is not limited to the use of the mails and/or wires, both domestically and internationally, to (a) transmit Title Trading's illegally obtained proprietary information on a regular and continuous basis over the wires, (b) arrange their dealings and contractual understandings, (c) engage in actual trades using the pilfered Title information, (d) maintain their communication regarding status and updates of their activities, (e) recruit other members to their activities, and (f) engage in countless other uses of mails, wires, computers, emails, and telephones to further the fraudulent conspiracy and racketeering activity defined above.

91. The RICO Defendants implemented this scheme and possessed a specific intent to defraud Title Trading, and used the mails and wires in furtherance of this scheme. Additionally each of the RICO Defendants conspired and agreed to commit some or all of the acts above.

92. These continuous acts were all related to furthering the RICO Defendants' goal of defrauding Title Trading.

93. This pattern or racketeering activity was directly connected with the RICO Defendants' establishment, formation, and control of several enterprises:

   a. Karma Technologies, Ltd. (previously defined as "Karma"), is an enterprise which continuously engaged in various unfair business practices affecting interstate and foreign commerce.

   b. Coastal Management, LLC (previously defined as "Coastal") is an enterprise which has continuously engaged in other unfair business practices affecting interstate and foreign commerce.

   c. The combination of Karma and Coastal created an association in fact enterprise, separate and apart from the RICO Defendants, which has

continuously engaged in other unfair business practices affecting interstate and foreign commerce.

    d.  The RICO Defendants are a group of individuals that created an additional association-in-fact enterprise, separate and apart from the Karma Technologies and Coastal Management.

94.    Each of the RICO Defendants have invested income derived from the pattern of racketeering activity in the acquisition of interests in and establishment or operation of the enterprises referenced above. Additionally, they have invested income derived from the pattern of racketeering activity in the acquisition of interests in the acquisition of interests in other enterprises, including the securities of other enterprises represented by the securities that were purchased with the illicitly obtained information herein identified. In so doing, 18 U.S.C. § 1962 (a) and § 75D–4(a)(1) have been violated.

95.    Furthermore, each of the RICO Defendants has conducted the affairs of the enterprises named through the pattern of racketeering activity described above. In so doing, 18 U.S.C. § 1962 (c) and § 75D–4(a)(2) have been violated. For purposes of this paragraph, all RICO Defendants are alleged alternatively to have been involved with respect to each enterprise identified above, except that in each alternative configuration or combination, the relevant enterprise itself is excepted from the allegation of that particular violation.

96.    All RICO Defendants are alleged to have conspired to violate 18 U.S.C. §§ 1962 (a) & (c) as well as §§ 75D–4(a)(1) & (2), thus constituting a violation of 18 U.S.C. § 1962 (d) and § 75D–4(a)(3), respectively.

97.    The RICO Defendants are all engaged in interstate and/or foreign commerce, and their acts have affected interstate and foreign commerce.

98.    The RICO Defendants' actions constitute violations of 18 U.S.C. § 1962, and give rise to civil liability under 18 U.S.C. § 1964. The RICO Defendants' actions constitute violations of § 75D–4, and give rise to civil liability under § 75D–8.

33

99.     Title Trading's business and property have been injured by reason of the RICO Defendants' violations, and such conduct warrants an award of actual damages, treble damages and costs, including reasonable attorneys' fees, and other relief afforded by the RICO Statutes.

### J.  Joint Participation

100.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

101.     Each of the Defendants has acted to aid others in the commission of the acts herein complained of with actual knowledge of not only the acts being committed, but of the legal consequences of such acts.  Each Defendant has knowingly rendered aid and assistance to the wrongful acts of the others, with a view towards seeing the wrongful acts accomplished. Without limiting the generality of the foregoing, the Defendants joined together for the purpose of inducing, causing, actively participating in, and personally benefiting from, the misappropriation of Title Trading's confidential, proprietary or trade secret information, tortious interference with contract, conversion, and various breaches of fiduciary and confidential relationships.

102.     The acts taken by the Defendants were intended to facilitate the accomplishment of the overall goals and the commission of the acts herein complained of.  By virtue of the fact that the Defendants knew or should have known that Kundu obtained confidential, proprietary or trade secret information during his employment under Title Trading, and in particular knew or should have known that Kundu had access to the valuable confidential, proprietary or trade secret information, they knew or should have known that their acts would have the effect of aiding the breaches herein complained of.

103.     Title Trading has been damaged as a direct and proximate result of the acts of the Defendants herein alleged.

104.     As a result, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

## K.  Aiding and Abetting

105.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

106.     Each of the Defendants has knowingly acted to aid others in the commission of the tortious acts herein complained of with actual knowledge of not only the acts being committed, but of the legal consequences of such acts.  Each Defendant has knowingly rendered aid and assistance to the wrongful acts of the others, with a view towards seeing the wrongful acts accomplished.  Without limiting the generality of the foregoing, the Defendants joined together for the purpose of inducing, causing, actively participating in, and personally benefiting from, the misappropriation of Title Trading's confidential, proprietary or trade secret information, tortious interference with contract, conversion, and breach of fiduciary duty.  Each Defendant was under a duty not to accomplish or participate in any of these and each was acting for its own advantage and benefit in connection with the conspiracy.  The acts taken by the Defendants were intended to facilitate the accomplishment of the overall goals and the commission of the acts herein complained of.  By virtue of the fact that the Defendants knew or should have known that Kundu obtained confidential, proprietary or trade secret information during his employment under Title Trading, and in particular knew or should have known that Kundu had access to the valuable confidential, proprietary or trade secret information, they knew or should have known that their acts would have the effect of aiding the breaches herein complained of.  Title Trading has been damaged by the acts of the Defendants undertaken as a part of the conspiracy herein alleged

107.    As a result, each of the Defendants is jointly liable for any breaches of a fiduciary and/or confidential relationship which existed with Title Trading.

108.    As noted, any interests or monies which any of the Defendants have obtained in connection with the aiding and abetting of one another in the breach of fiduciary duties are subject to a constructive trust.

109.    As a direct and proximate result of the Defendants' actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial.

### L.  Agency Theories; Joint and Several Liability

110.    Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

111.    Each of the Defendants operated as an instrumentality of the other, and were acting for and on behalf of the other Defendants. Without limiting the generality of the foregoing, Title Trading alleges, on information and belief, that the Defendants utilized in whole or in part, employees and/or comingling of employees, offices, and/or assets of the others for purposes of undertaking the conduct herein complained of to such a degree that their activities are intertwined.  Furthermore, each of the Defendants has participated in the aforementioned matters to accomplish the common goals hereinabove set forth.

112.    Without limitation, all acts herein complained of were undertaken by Kundu, for and on behalf of the Non-Employee Defendants, and for the direct pecuniary benefit of the Non-Employee Defendants.  The concerted actions of the Defendants created an alliance, for a common purpose, involving a community of interest and an equal right to direct and govern the actions of the other parties.  Such acts were in the scope and course of agency and/or service of the Non-Employee Defendants.  Indeed, such acts were taken at facilities over which the Non-

Employee Defendants exercised control and supervision. Furthermore, all parties combined to a meaningful degree their property, money, efforts, skill and/or knowledge in this common undertaking, anticipating the benefit of all of them.

113.    As such, the Defendants are fully liable for the acts and omissions undertaken by the other Defendants. Without limiting the foregoing, the Non-Employee Defendants are fully liable for the acts and omissions undertaken by Kundu, including breaches of a fiduciary and/or confidential relationship that existed with Title Trading.

114.    Without limiting the generality of the foregoing, Defendants are liable under applicable legal theories such as joint venture; joint adventure; joint enterprise; partnership by estoppel; joint liability and responsibility; the net effect of all of which is to render each and every Defendant jointly and severally liable for the acts and obligations of the other.

115.    Furthermore, in committing the acts herein complained of, even if a person was acting in an agency capacity for a company, such as Preston for Coastal, each person is still jointly and severally liable for the torts which he commits.

116.    As a direct and proximate result of the Defendants' actions, Title Trading has suffered and will continue to suffer compensable injury and loss, in an amount to be proven at trial, for all such damages all Defendants and each of them are jointly and severally liable.

**M.  Unjust Enrichment.**

117.    Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

118.    Title Trading brings a claim for unjust enrichment against the Defendants. Without limiting the generality of the foregoing Kundu owed duties to Title Trading to refrain from disclosing and/or using the confidential, proprietary or trade secret information for the benefit of the Non-Employee Defendants. The Non-Employee Defendants knew, actually or

37

constructively, the obligations of these parties, and worked with them to secure for themselves the economic benefits of Title Trading's assets. The Non-Employee Defendants have unlawfully taken property that rightfully belongs to Title Trading and are in receipt of benefits therefrom, including Title Trading's confidential and proprietary information. The Non-Employee Defendants have unjustly retained those benefits at the expense of Title Trading. Additionally, the Non-Employee Defendants have wrongfully expropriated for themselves unique business opportunities of Title Trading when the Defendants were under a legal duty not to do so.

119.    Accordingly, the assets and profits of the Defendants derived therefrom taken from, directly or indirectly, Title Trading who is considered in equity as the beneficial owner, should be returned to Title. This includes with out limitation all funds or property that can be demonstrated to be proceeds or profits made by the Defendants through their use of the assets of Title, including the RefArb Trading Strategy, the Implementing Software and/or the Execution Software, and any derivatives thereof, as well as assets purchased therewith, all of which are equitably the property of Title.

120.    Title Trading has been damaged as a direct and proximate result of the Defendants' unjust retention of Title Trading's confidential and proprietary information and as a result of the Defendants' wrongful expropriation of Title Trading's unique business opportunities. It would be unjust for the Defendants to be able to keep the benefits of the value of the assets that have been taken from Title Trading, when that value was wrongfully acquired and diverted.

121.    As a result, each Defendant is jointly and severally liable to Title Trading for restitution of the benefits derived by such Defendants. The amount of the Defendants' unjust enrichment will be proven at trial.

## N. Constructive Trust.

122. Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

123. The Defendants have benefitted from their misappropriation of Title Trading's confidential, proprietary or trade secret information and the other acts herein complained of as well as in the breach of fiduciary duties which were owed to Title. The Defendants' conduct in taking, using, and profiting from Title Trading's confidential, proprietary or trade secret information and other conduct herein complained of is so unconscionable that they cannot equitably retain the property which really belongs to Title Trading. Accordingly, a constructive trust should be impressed upon the property, assets and profits of the Defendants derived therefrom in favor of Title Trading, who is in good conscience entitled thereto, and who is considered in equity as the beneficial owner. This includes with out limitation all funds or property that can be demonstrated to be proceeds or profits made by the Defendants through their use of the assets of Title, including the RefArb Trading Strategy, the Implementing Software and/or the Execution Software, and any derivatives thereof, as well as assets purchased therewith, all of which are equitably the property of Title.

124. Without limiting the generality of the foregoing, the Defendants obtained and held Title Trading's confidential, proprietary or trade secret information, even when they knew the valuable and sensitive information and property belonged to Title Trading. Moreover, Kundu disclosed confidential, proprietary or trade secret information to the Non-Employee Defendants and/or used such information for the direct financial benefit of the Non-Employee Defendants, despite owing an obligation to return such information, otherwise maintain its confidentiality, and not use same for the benefit of the Non-Employee Defendants. The Defendants, themselves and/or through their employees and/or consultants then used the confidential, proprietary or trade

39

secret information for themselves. The Defendants have been and continue to be unjustly enriched.

125. Furthermore, the Defendants knew or had reason to know that the confidential, proprietary and/or trade secret information was private, confidential, and sensitive. Moreover, the Defendants knew that Kundu had a duty to hold such information in the strictest confidence, and not to disclose such information without express authorization from Title Trading or use it for the financial benefit of the Defendants, and that they were so doing.

126. By virtue of Defendants' wrongful and unconscionable conduct Title Trading is entitled to the imposition of a constructive trust on all funds, proceeds, and profits obtained by the Defendants by use of Title Trading's confidential, proprietary or trade secret information.

### O. Unfair and Deceptive Trade Practices.

127. Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

128. The Defendants engaged in unfair and/or deceptive trade practices in violation of N.C. Gen. Stat. 75.1 et seq. by, inter alia, intentionally interfering with the contractual relationships and prospective business advantages of Title Trading, breaching and participating in the breach of fiduciary duties to Title Trading, constructively defrauding Title Trading, usurping Title Trading's business opportunities as described herein, violating Title's trade secrets rights, and engaging in the other conduct herein described.

129. The conduct of Defendants described herein occurred in commerce and affected commerce in North Carolina.

130. Defendants' unfair and deceptive trade practices adversely affected Title Trading's business and proximately caused Title Trading damage in an amount to be proved at trial.

131.    Title Trading is entitled to treble damages pursuant to N.C. Gen. Stat. §§ 75.16 & 75-16.1.

**P.  Declaratory Judgment that any Developments or improvements
by Kundu and the other Defendants related to the
Trading Methods and Techniques belong to Title Trading.**

132.    Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

133.    Kundu's agreements with Title Trading contained provisions stating that all improvements, ideas, inventions, or developments related to Title Trading's business created or conceived during the period of his employment shall be the property of Title Trading. These same duties arise by virtue of common law duties.   Title Trading hereby seeks a declaration that it owns any improvements or developments and programs or algorithms designed, in whole or in part by Kundu or any of the Defendants, on which Kundu or any of the Defendants worked together and/or which are based on or derived from any such work and, therefore, are and remain the sole property of Company.

**Q.  Accounting.**

134.    Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

135.    Title Trading hereby requests an accounting of all of the profits generated by all of the Defendants arising out of or relating to the utilization of the assets of Title Trading converted as alleged above.  This request includes a request for accounting of the finances and profits of (a) Kundu and any of the other Defendants received in "mirroring" trades executed by them in whole or in part relying on information and data which belong to Title Trading; (b) any profits of any of the Defendants, directly or indirectly, from not only utilization of Title Trading proprietary information, but also the raising of money from investors based upon the exploitation

of Title Trading's assets; (c) any trading profits generated by any of the Defendants utilizing any of the Title Trading proprietary information, in whole or in part; (d) any so-called fees or commission charges generated by, directly or indirectly, any of the Defendants or any of their affiliates in connection with any trades actually made using any of the Title Trading assets, or generated for any other reason; (e) any fees, charges, profits, commissions or other so-denominated receipts generated by Defendants, including Coastal, with respect to their utilization of any assets of Title Trading in connection with bringing in other investors with respect to the exploitation of Title Trading's assets.

## VI.
## REQUEST FOR PUNITIVE DAMAGES

136.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

137.     Defendants performed these actions willfully, intentionally and with malice. Further, the acts and practices the Defendants have perpetrated and/or participated in have been committed by the Defendants as a part of a pattern and practice of business.  This conduct warrants the imposition of exemplary damages, and the imposition of a constructive trust over the assets and property of Title Trading that they have expropriated, disgorgement and fee forfeiture, where appropriate.  Further, Defendants' actions were committed with legal malice, such that Title Trading is entitled to recover, and requests, exemplary damages from Defendants.

## VII.
## TEMPORARY RESTRAINING ORDER/
## TEMPORARY INJUNCTION

138.     Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

139.    Title Trading will sustain irreparable injury if injunctive relief in the form of a temporary restraining order and a preliminary injunction are not entered.  The Defendants are spread out throughout many parts of the world.  Furthermore, the primary architect of this fraudulent scheme, Defendant Kundu, is not even a U.S. citizen but was in the United States on an H-1B non-immigrant work visa working for Title Trading.  Having been terminated by Title Trading, Defendant Kundu is likely to leave soon to return to India if he can't find another employer that will sponsor him as Title Trading did.  The computer code which the Defendants have taken in particular can be easily copied in a multitude of ways which makes it extremely difficult for both the Plaintiff Title Trading as well as this Court to keep track of and prevent the proliferated piracy of this data.  This is particularly true given the ease of interstate transportation and the fact that faced with a federal lawsuit, the Defendants may seek to either destroy and/or copy all or portions of the trade secrets they have pilfered.  This secreting of information or otherwise copying and transmitting it out of the country will greatly exacerbate the harm which Title Trading will experience as this code once secretly installed on other servers can be very difficult if not impossible to detect in its use and operations.  This is particularly the case where international users are concerned.

140.    Title Trading incorporates by reference herein the additional matters set forth in its Application for Temporary Restraining Order and Preliminary Injunction, a copy of which is being filed simultaneously with the Complaint for further reasons as to why Title Trading is justly entitled to this injunctive relief.

## VIII.
## REQUEST FOR PERMANENT INJUNCTION

141.    Title Trading re-alleges and incorporates by reference all of the other paragraphs of this Complaint as if set forth in full herein.

43

142.     There has been a present danger that Defendants would destroy, transfer and/or use Title Trading's data and trade secrets.  Title Trading would and will sustain irreparable injury if injunctive relief is not granted and maintained.  Title Trading would and will also suffer irreparable harm if it's confidential and proprietary and/or trade secrets are used by and/or revealed, or continue to be used and/or revealed, to or by, as the case may be, the Non-Employee Defendants, or another one of Title Trading's competitors.  Accordingly, Title Trading is entitled to injunctive relief under North Carolina law.

## IX.
## JURY DEMAND

143.     Title Trading requests a trial by jury.

## X.
## PRAYER

WHEREFORE, PLAINTIFF TITLE TRADING SERVICES USA, INC. requests that Defendants be cited to appear and answer, and respectfully requests that this Court award:

a.     permanent injunctive relief;

b.     judgment against Defendants for a sum for damages to be proven in this litigation;

c.     judgment against the Defendants for all facets of profits received by the Defendants generated, directly or indirectly from the use of Title Trading's trade secret and confidential and proprietary information;

d.     a constructive trust upon the property, assets and profits of the Defendants derived from their unlawful and improper conduct in favor of Title Trading;

e.     judgment against Defendants for a sum to be requested at trial of this matter representing exemplary and/or punitive damages for their malicious, intentional and/or wrongful conduct;

f.     costs and attorneys' fees;

g.     prejudgment and post-judgment interest as provided by law; and

h.     such other and further relief to which Title Trading may be justly entitled.

Respectfully submitted,

 /s/  Eric H. Cottrell
Eric H. Cottrell
N.C. State Bar No. 21994
Parker Poe Adams & Bernstein LLP
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
ericcottrell@parkerpoe.com
*Attorney for Plaintiff Title Trading Services USA, Inc.*

Ben C. Broocks *(pro hac pending)*
Texas Bar No. 03058800
bbroocks@broockslawfirm.com
8704 Mendocino Drive
Austin, Texas  78735
(512) 201-2000
(512) 201-2032 - Fax

## DECLARATION OF GEORGE ELIO

I, George Elio hereby certify that I am the President of Title Trading Services USA, Inc ("Title Trading"). I am over the age of twenty-one (21) and have never been convicted of a felony. I have reviewed the Plaintiff's Original Verified Complaint and Application for Temporary Restraining Order and Preliminary and Permanent Injunction and every factual statement contained therein is true and correct. I declare under penalty of perjury that the foregoing is true and correct.

04/29/14
_____
Date

_____
George Elio