UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH
CAROLINA CHARLOTTE DIVISION
3:14-CV-225-RJC-DCK

| | |
|---|---|
| TITLE TRADING SERVICES USA, INC. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| ARINDAM KUNDU, COASTAL ) | |
| MANAGEMENT, LLC, MARC ) | |
| PRESTON, SYED SAIF ASHRAF, ) | |
| DEREK CHIU, and ELIOT T. SMITH, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFAULT JUDGMENT AND PERMANENT INJUNCTION

**THIS MATTER** comes before the Court on the Agreed Joint Motion for Entry of Default, Final Judgment and Permanent Injunction (the "Motion"), (Doc. No. 97), filed by Plaintiff Title Trading Services USA Inc. ("Plaintiff" or "Title Trading") and Defendants Coastal Management LLC ("Coastal Management"), Marc Preston ("Preston"), Syed Saif Ashraf ("Ashraf"), and Derek Chiu ("Chiu") (collectively, the "Settling Defendants") against Defendant Arindam Kundu ("Kundu"), pursuant to Federal Rule of Civil Procedure 55. Kundu has not contested nor responded to the Motion and the time for doing so has expired. Having considered the Motion, the Affidavit in Support of Default Judgment and Permanent Injunction (the "Affidavit in Support"), (Doc. No. 98), the record in this case, and the applicable law, the Court **FINDS** as follows:

## I. BACKGROUND

Title Trading and the Settling Defendants have announced that they have resolved their differences in this action and in connection therewith have stipulated to the entry of a Final Judgment and Agreed Permanent Injunction. (Doc. Nos. 96, 97). Pursuant to the Motion, Title Trading requests that the Court enter a default judgment and permanent injunction against Kundu, which the Settling Defendants consent to and support.

After examination of the uncontested evidence submitted by Plaintiff in this matter, the record of this matter as a whole, and the Motion for Entry of Default against Kundu, (Doc. No. 97), which remains uncontested, the Court has determined that a hearing on the instant motion is unnecessary, as the Court has held two prior hearings in this matter, Kundu has failed to appear before the Court in this case, and the decisional process would not be aided by oral argument. Fed. R. Civ. P. 78(b).

### A. Established Facts

Because of his default in this matter, Kundu is deemed to have admitted those well-pleaded facts alleged in the Complaint that are material to Plaintiff's claims against them. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001) (quoting Nishimatsu Const. Co. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)). Accordingly, the factual summary below is consistent with that alleged in Plaintiff's Complaint.

The Verified Complaint (Doc. No. 1: Complaint), which Kundu failed to answer, as well as the declaration evidence submitted by Title Trading in connection with its motion for temporary restraining order and preliminary injunction, (Doc. No. 6),[1] and the Affidavit in Support establish the facts set forth herein.

---

[1] The Declaration of George Elio, president of Title Trading, (the "Elio Declaration") is filed on the record as Exhibit 1 to Doc. No. 6 and attached to the Motion. The Declaration of Title

Title Trading is a financial, technology, and principal trading firm that, among other things, employs traders to create strategies and trade Title Trading's funds in various securities markets utilizing those strategies. (Complaint ¶18). As a vital part of its business, Title Trading hires quantitative analysts (or "quants"), traders and developers to develop various proprietary trading strategies which can be successfully implemented for Title Trading, which strategies can include a wide range of things including for example, (a) identifying target securities and opportunities, (b) identifying predictive indicators for particular securities or transactions, (c) developing trading models, (d) constructing algorithms for trading, and (e) devising analytic tools to gather and analyze combinations of factors to be deployed in trading, among a myriad of other matters which may go into the development and refinement of a successful trading strategy. (Id.).

The proprietary trading of securities is a very highly competitive business and fortunes can be made or lost depending on the success of a trading strategy. (Id.) Thus, competition is fierce for the development of successful strategies to be deployed. Title Trading employs a number of people to research, develop, enhance, maintain, operate and deploy a variety of confidential and proprietary trading strategies for Title Trading's account and spends significant sums to develop these confidential and proprietary strategies. (Id.)

Additionally, Title Trading is a technology company. (Id. ¶19). Title Trading employs people with expertise in trading technology, including creating software in general and source and object code writing (and revisions thereto) in particular, as well as hardware configurations, to be used in conjunction with the deployment of Title Trading's trading strategies. Thus, Title Trading

---

Trading's employee Seif El Kilany (the "SEK Declaration") is filed on the record as Exhibit 2 to Doc. No. 6 and attached to the Motion. Capitalized terms used in the recitation of facts but undefined, shall have the meanings set forth in the declarations and/or the Complaint, as applicable.

will often instruct employees with expertise in technology to work with employees developing strategies, to create a more effective way of automating the trading process for the Company. (Id.)

Title Trading's proprietary trading strategies and technology are the result of very significant ongoing research and development efforts employed by Title Trading's employees and professionals. (Id.). The research and development to create, test and deploy, and make ongoing adjustments to, proprietary strategies and technologies depends almost entirely on a large body of confidential information not available to the public or anyone outside of Title Trading. (Complaint ¶33). The strategies and technology developed by Title Trading have taken many years and a very significant financial commitment to develop. Further, this large body of confidential information provides Title Trading with a significant advantage over its competitors, who would be given an enormous advantage if they could gain access to the strategies and technologies that have been developed by Title Trading, without having to incur the time and expense themselves to develop. If Title Trading's confidential and proprietary strategies and technologies were to fall into the hands of competitors, those persons could use and/or modify such information to identify the same valuable trading opportunities currently being identified and worked by Title Trading, and usurp those opportunities to unjustly enrich themselves. In fact, many strategies and technologies at issue in this case would be rendered less valuable if others were using them at the same time, given the particular functions of these strategies, which are liquidity sensitive. (Id.).

Defendant Arindam Kundu ("Kundu") is a citizen of India. (Complaint ¶20). Kundu was employed as a Quant Strategist/Developer for Title Trading from July 20, 2009, through March 21, 2014, when he was terminated for cause. Attached as Exhibit 1 to the Complaint is Kundu's Employment Agreement dated July 20, 2009 (the "Employment Agreement"). (Id.). Title Trading sponsored Kundu as an H-1B immigrant pursuant to United States immigration laws, which meant

that legally he could work only for Title Trading. (Id.). Specifically, in that capacity, he was employed by Title Trading to work with others within the Title Trading organization who had developed strategies, in order for Kundu to develop the supporting technology and programing to implement or deploy those strategies. (Complaint ¶21). As such, among other things, Kundu was in constant contact with Title Trading's confidential and proprietary trading strategies, learning them firsthand as he wrote the code to implement, monitor, test, deploy and modify both the strategies and the technologies which utilized those strategies. (Id.).

Ultimately Kundu was assigned by Title Trading to develop and enhance an existing trading strategy that the Company had given the code name "RefArb," with help and the expertise of Title Trading's Head of Global Trading Services, Seif El Kilany ("SEK"). (Complaint ¶23). SEK (a) was a subject matter expert on market structure, (b) had knowledge of the RefArb strategy while employed by the Company, and (c) was working for the Company to help quants within Title Trading develop and enhance the particular trading strategy (herein called the "RefArb Trading Strategy"). (Id.). The RefArb Trading Strategy is one that the Company has been working on and investing money to develop and perfect for many years. In fact, Title Trading has invested well over $1,000,000 in researching, developing, testing, deploying and reconfiguring the RefArb Trading Strategy over a long period of time. (Id.). Kundu's responsibilities required him to (a) gain an intimate familiarity with the RefArb Trading Strategy, (b) work to create technology what would embody that strategy, and then (c) create technology to make securities executions based on that strategy. (Complaint ¶30).

Unknown to Title Trading at that time, Kundu was getting deeper into personal debt and was seeking ways to financially capitalize on the information and knowledge that he was garnering from his employment with the Company. (Complaint ¶35). Kundu secretly put into place a

programing group, consisting of, among others, various programmers and software developers, one of whom was Mutawaqqil Billah, who were given copies of Title Trading's proprietary code, and thus the strategies they embodied, that had been written exclusively for Title Trading. (Id.). Kundu and the others continued to make programming changes to Title Trading's code to deploy for the Defendants themselves the strategies and the technology that Kundu was developing while working on for the Company, albeit secretly. (Id.).

While Kundu continued working with SEK for the Company – creating the appearance of being an honest, faithful agent – he was befriending other traders to gain access to Title Trading's strategies. (Complaint ¶37). Behind this façade, however, he was secretly taking the RefArb Trading Strategies and technologies and deploying and using them for his own gain. (Id.). The entire conspiracy came to light as a result of an anonymous phone call received by the President and CEO of Title Trading. (Complaint ¶47). The anonymous caller (the "Anonymous Caller") among other things identified that he had known Defendant Kundu from an effort the Anonymous Caller had made to earlier try to work a deal out with Kundu similar to the deal. (Id.).

After having been advised of Kundu's gross infidelities, the Company accessed a Company computer that had been entrusted to Kundu pursuant to its contractual rights with Kundu under the Employment Agreement to inspect all Company property and systems, and was able to extract incriminating emails and videos as referenced hereinabove, confirming what Title Trading had been told. (Complaint ¶49).

B. Procedural Background

Title Trading filed suit on April 29, 2014. (Doc. No. 1). On May 2, 2014, this Court issued an order restraining all Defendants, under Rule 65(b) of the Federal Rules of Civil Procedure, from all use of Plaintiff's intellectual property, to include its Implementing Software and Execution Software (the "Temporary Restraining Order"). (Doc. No. 12).

After one extension of the Temporary Restraining Order, the Court conducted a hearing on May 29, 2014, to determine whether to convert the Temporary Restraining Order into a preliminary injunction. At the time of the hearing, Plaintiff had filed its proof of service of process against Coastal, Preston, Chiu, and Ashraf. No other Defendants appeared at the hearing personally or through counsel.

At the hearing, this Court recognized that Plaintiff had made a sufficient showing for a preliminary injunction, but recognized the limits on the Court's authority to extend injunctive relief of indeterminate duration against parties who had not been served. Plaintiff announced that they had reached an agreement with Defendants Preston and Coastal to a stipulation adopting the terms of the temporary injunction. The Court noted that it would adopt the terms of the stipulation as a preliminary injunction of this Court. Following the hearing, Plaintiff entered into stipulations of injunction with four of the Settling Defendants. (Doc. Nos. 22 (Coastal and Preston), 41 (Chiu), and 42 (Ashraf)).

This Court entered its order allowing Kundu to be served by alternative means on August 14, 2014. (Doc. No. 61). Pursuant thereto, Kundu was served in August 2014. (Doc Nos. 70 & 71). Defendant Smith was served in September 2014. (Doc. No. 78). Thereafter, this Court entered its preliminary injunction against Kundu and Smith. (Doc. No. 90).

Despite Kundu having actual notice of the suit and receiving proper service of the Complaint and summons, Kundu has failed to file an answer to the Complaint. As a result thereof, Plaintiff submitted a Motion for Entry of Default against Kundu, (Doc. No. 93), and the Clerk of Court made the Entry of Default on September 22, 2015, (Doc. No. 94).

Plaintiff has now filed the Motion at issue in this order, seeking an entry of default judgment and permanent injunction against Defendant Kundu. Defendant Kundu has not responded to the Motion, and the time for doing so has expired.

## II.  LEGAL STANDARD

The entry of default judgment is governed by Rule 55 of the Federal Rules of Civil Procedure which provides, in relevant part, that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once a default is entered, a plaintiff may seek a default judgment against the defaulting defendant. Fed. R. Civ. P. 55(b).

Upon the entry of default, the defaulting party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint. Ryan, 253 F.3d at 780 (quoting Nishimatsu Const. Co., 515 F.2d at 1206); Weft, Inc. v. GC Inv. Assocs., 630 F. Supp. 1138, 1141 (E.D.N.C. 1986); see also Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). However, the defendant is not deemed to have admitted conclusions of law, and the entry of "default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." Ryan, 253 F.3d at 780 (quoting Nishimatsu Const. Co., 515 F.2d at 1206). Rather, in determining whether to enter judgment on the default, the court must

determine whether the well-pleaded allegations in the complaint support the relief sought. See Ryan, 253 F.3d at 780; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 2688 (3d ed. Supp. 2015) ("[L]iability is not deemed established simply because of the default and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

To that end, the Fourth Circuit has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton Preparatory Acad., Inc. v. Hoover Univ., Inc., 616 F.3d 413, 417 (4th Cir. 2010). Nonetheless, "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party." SEC v. Lawbaugh, 359 F. Supp. 2d 418, 421 (D. Md. 2005).

If the Court finds that liability has been established, it must then determine damages. See Ryan, 253 F.3d at 780–81; Arista Records LLC v. Gaines, 635 F. Supp. 2d 414, 416–18 (E.D.N.C. 2009). The Court cannot accept factual allegations of damages as true; therefore, it must make an independent determination regarding damages. See Lawbaugh, 359 F. Supp. 2d at 422. The Court may rely on affidavits or documentary evidence in the record to determine the appropriate amount of damages. See Pope v. United States, 323 U.S. 1, 12 (1944); EEOC v. North Am. Land Corp., No. 1:08-cv-501, 2010 WL 2723727, at *2 (W.D.N.C. Jul. 8, 2010).

### III. DISCUSSION

Title Trading has asserted eighteen causes of action ("COA").[2] The factual allegations supporting each cause of action are set forth in the Complaint and incorporated herein by reference.

---

[2] These include: Breach of Contract (COA A); Tortious Interference with Contract (COA B); Interference with Prospective Economic Advantage (COA C); Misappropriation of Title Trading's Trade Secrets and Confidential and Proprietary Information (COA D); Breach of Fiduciary Duty (COA E); Conversion and Theft (COA F); Fraud by Omission/Constructive

A. Causes of Action

In summary, Kundu entered into an employment agreement with Title Trading. The Employment Agreement between Kundu and Title Trading is valid and enforceable. The allegations in the Verified Complaint and the unanswered evidence submitted demonstrate that Kundu has breached the Employment Agreement.³ In Kundu's Employment Agreement, among other things, he agreed and was obligated to do and not do, as the case may be, the extensive obligations as set forth in the Employment Agreement and summarized in the Complaint. (Employment Agreement; Compl. ¶9). The allegations in the Verified Complaint and evidence submitted demonstrate that Kundu, while a trusted fiduciary, was the mastermind of a conspiracy to engage in a surreptitious and systematic theft of the Title Trading's trade secrets. The Court has been presented with email evidence that demonstrates Kundu's illicit actions. (Compl. ¶43). These emails and other allegations in the Verified Complaint and evidence submitted demonstrate Kundu's clear breach of his Employment Agreement.

The agency of an important employee can arise from a principal/agent relationship, or may exist as a matter of fact as a result of confidence reposed on one side the resulting superiority and influence on the other. See Howard v. Carroll Cos., Inc., No. 1:12CV146, 2013 WL 3791619 *5 (W.D.N.C. July 19, 2013). The breach of the confidences created by virtue of this fiduciary

---

Fraud (COA G); Conspiracy (COA H); Violation of the Racketeer Influenced and Corrupt Organization ("RICO") Acts (Federal and State (COA I); Joint Participation (COA J); Aiding and Abetting (COA K); Agency Theories; Joint and Several Liability (COA L); Unjust Enrichment (COA M); Constructive Trust (COA N); Unfair and Deceptive Trade Practices (COA O); Declaratory Judgment that any Developments or improvements by Kundu and the other Defendants related to the Trading Methods and Techniques belong to Title Trading (COA P); Accounting (COA Q).

³ Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Johnson v. Colonial Life & Accident Ins. Co., 618 S.E .2d 867, 870 (N.C. Ct. App 2005).

relationship give rise to claims for breach of fiduciary duty.[4] The existence of the fiduciary duty also gives rise to claims for constructive fraud (also referred to as "fraud by omission").[5] The allegations in the Verified Complaint and evidence submitted demonstrate that Kundu was a valued and trusted agent of Title Trading. (See Compl. ¶20; Elio Decl. ¶7). Kundu's responsibilities required him, as instructed and overseen by Title Trading and its other agents, to (a) gain an intimate familiarity with the RefArb Trading Strategy, (b) work to create technology that would embody, enable and facilitate that strategy, and then (c) create technology to make securities executions based on that strategy. (Compl. ¶30; Elio Decl. ¶¶14–15; SEK Decl. ¶7).

The allegations in the Verified Complaint and evidence submitted demonstrate that the RefArb Trading Strategy, the Implementing Software, and the Execution Software are all confidential and proprietary trade secrets of Title Trading.[6] (Compl. ¶18; Elio Decl. ¶18; SEK Decl. ¶10). Among other things, the allegations in the Complaint and evidence submitted demonstrate that that the RefArb Trading Strategy, Implementing Software, and the Execution Software were not available to the public or to anyone outside of Title Trading. (Compl. ¶19; Elio Decl. ¶19; SEK

---

[4] To prove a breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) a breach of that duty; and (3) the breach proximately caused plaintiff's injury. See Green v. Freeman, 749 S.E.2d 262, 268 (N.C. 2013); Alcorn v. Bland, 224 N.C. App. 397 (2012). The fiduciary duty of agents includes making "full and truthful disclosure of all known or discoverable [material] facts likely to affect the client." Sutton v. Driver, 712 S.E.2d 318, 323 (N.C. Ct. App. 2011).

[5] To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." Crumley & Associates, P.C. v. Charles Peed & Associates, P.A., 730 S.E.2d 763, 767 (N.C. Ct. App. 2012). Claims for "Fraud by Omission" are in essence claims for constructive fraud arising from a breach of a fiduciary duty to speak. Harton v. Harton, 344 S.E.2d 117, 118–19 (N.C. Ct. App. 1986) (describing the three situations giving rise to an affirmative duty to disclose).

[6] The elements of a prima facie case for misappropriation of trade secrets under North Carolina law are "(1) [the defendant] knows or should have known of the trade secret; and (2) [the defendant] has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66–155.

Decl. ¶10). These strategies and technologies developed by Title Trading have taken many years and a very significant financial commitment to develop. (Id.). Further, the allegations in the Complaint and evidence submitted demonstrate that this large body of information included within the RefArb Trading Strategy, the Implementing Software, and the Execution Software provided Title Trading with a significant advantage over its competitors who would be given enormous advantages if they could gain access to them without having to incur the time and expense themselves to develop, and competitors could simply modify the information to identify the same trading opportunities identified and worked by Title Trading and thus usurping for themselves opportunities belonging to Title Trading to unjustly enrich themselves. (Id.).

Further, allegations in the Verified Complaint and evidence submitted demonstrate that that many of the strategies and technologies involved in the RefArb Trading Strategies, Implementing Software, and the Execution Software are rendered less valuable if others were using them at the same time, because these strategies were in particular liquidity sensitive. (Id.).

The allegations in the Verified Complaint and evidence submitted demonstrate that Title Trading took reasonable steps to safeguard the secrecy of the SEK Trading Strategy, Implementing Software, and the Execution Software. (Compl. ¶34; Elio Decl. ¶20). As a result, these particular items are established as trade secrets of Title Trading. Furthermore, there is no question but that Kundu had both the opportunity and actually did acquire for disclosure and/or use Title Trading's trade secrets without any authority from Title Trading. (Compl. ¶37–38; Elio Decl. ¶30). Given the foregoing, the allegations in the Complaint and evidence submitted demonstrate that a claim for violation of the North Carolina Trade Secrets Act has been established. N.C. Gen. Stat. § 66-154(a).

The allegations in the Verified Complaint and evidence submitted demonstrate that a claim for unfair and/or deceptive acts arising under N.C. Gen. Stat. § 75–1.1.[7] "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987). Courts have broadly stated that "conduct which constitutes a breach of fiduciary duty and constructive fraud is" unfair or deceptive. See, e.g., Compton v. Kirby, 577 S.E.2d 905, 917 (N.C. Ct. App. 2003). "A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75–1.1." Medical Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 329 (N.C. Ct. App. 2009).

The allegations in the Verified Complaint and evidence submitted demonstrate that Title Trading has established its claim against Kundu for unjust enrichment[8] as well as constructive trust.[9] Under North Carolina law, a plaintiff asserting an unjust enrichment claim must show it conferred a benefit on another, the other party consciously accepting that benefit and the benefit was not conferred gratuitously. Southeastern Shelter Corp. v. BTU, Inc., 572 S.E.2d 200, 206 (N.C. Ct. App. 2002). Furthermore, a constructive trust can be established for money or property identified as belonging in good conscience to the plaintiff that can be traced to particular funds or property in the Defendants' possession. See, e.g., Great West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002).

---

[7] To establish a prima facie claim for unfair and deceptive trade practices, a plaintiff must show, "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Compton v. Kirby, 577 S.E.2d 905, 917 (N.C. Ct. App. 2003).

[8] Unjust enrichment occurs when: (1) a measurable benefit was conferred on the defendant; (2) the defendant consciously accepted the benefit; and (3) the benefit was not conferred gratuitously. Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 647 S.E.2d 111, 116 (N.C. Ct. App. 2007).

[9] See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002).

B. Permanent Injunction

Title Trading seeks a permanent injunction against Kundu as a remedy in this case. The Court has determined that it can properly provide the relief that Plaintiff seeks, namely a permanent injunction. Injunctive relief is specified in Kundu's contract as a contemplated remedy. (Employment Agreement ¶12.9). It is also available as a remedy for breaches of fiduciary duty. Darlington Mfg. Co. v. N. L. R. B., 397 F.2d 760, 775 (4th Cir. 1968). It is available for violations of the North Carolina Trade Secrets Act. N.C. Gen. Stat. § 66-154(a). Additionally, in a default judgment setting, injunctive relief is available. Mon Cheri Bridals, LLC v. Partnerships, No. 3:15-cv-21-FDW-DCK, 2015 WL 3509259, at *5 (W.D.N.C. June 4, 2015).

Permanent injunctive relief is appropriate where a plaintiff demonstrates that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 392–93 (2006).

With respect to the first factor, the allegations in Plaintiff's Verified Complaint that are deemed admitted in light of Kundu's default and also the evidence tendered, sufficiently prove irreparable injury. As noted, in cases of trade secret misappropriation, present here, the statute itself provides for preliminary injunctive relief. N.C. Gen. Stat. § 66-154(a). Simply the use of confidential information to compete was sufficient to establish irreparable injury in Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705 (M.D.N.C. 2009), and Merck & Co. v. Lyon, 941 F. Supp. 1443 (M.D.N.C. 1996). See also Picker Int'l, Inc. v. Blanton, 756 F. Supp. 971, 982–83 (N.D. Tex. 1990) ("[I]t is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a single trade secret may be disclosed is enough.") (quoting

FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 503 (5th Cir. 1982)). If Kundu is not enjoined from revealing the trade secrets, Title Trading will lose a competitive advantage in the industry. Welsh v. Rockmaster Equipment Mfg. Inc., 4 F. Supp. 2d 659, 668 (E.D. Tex. 1998) ("Once the proverbial bell has been rung, its sound can neither be recalled nor subsequently silenced."); Blanton, 756 F. Supp. at 983 (an injunction "is usually the only way use of the [trade] secret by the former employee can be prevented."). The North Carolina Supreme Court has stated that:

> injury is irreparable where the damages are estimable only by conjecture, and not by any accurate standard. To prove irreparable injury, it is not essential that it be shown that the injury is beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law.

Barr-Mullin, Inc. v Browning, 424 S.E.2d 226, 230 (N.C. Ct. App. 1993) (citations and quotation marks omitted).

The allegations in the Verified Complaint and evidence submitted establish and meet this standard. Among other things the trade secrets and other information that Kundu has misappropriated are "liquidity sensitive," which means that the success of the application of the trading strategy is affected by others who may be using the same strategy. Thus, its use by Kundu is, among other things, a form of illicit competition and is akin to a future loss of sales, and these may be considered irreparable damages because they are nearly impossible to quantify. See Health O Meter, Inc. v. Terraillon Corporation, 873 F. Supp. 1160, 1175 (N.D. Ill. 1995). Title Trading is at risk of suffering some or all of these classes of damage, and the precise contours of this loss will be very difficult to establish with precision.

The allegations in the Verified Complaint and evidence submitted demonstrate that: (a) every trade Kundu made is a separate act; (b) Kundu was trading scores of times each day; and (c) Kundu's acts took place over a very extended period of time. This constitutes misappropriation of

a trade secret of "such continuous and frequent recurrence that no reasonable redress can be had in a court of law." Barr-Mullin, 424 S.E.2d at 230. The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share. The allegations in the Verified Complaint and evidence submitted demonstrate that such is the case here, where Title Trading may be frozen out of the market place in its ability to offer this trading strategy to hedge funds, proprietary trading groups and others, if the market place perceives that the strategies have already been disclosed to and used by others. North Carolina courts have "consistently adhered to the proposition that where the principal relief sought is a permanent injunction, it is particularly necessary that the preliminary injunction issue." A.E.P. Indus., Inc. v. McClure, 302 S.E.2d 754, 763 (N.C. 1983).

With respect to the next element, the allegations in the Verified Complaint and evidence submitted demonstrate that Title Trading does not have a sufficient remedy at law if an injunction is not issued. A monetary remedy, valuing the damages which Title Trading has faced, to date, would be inadequate to reimburse Title Trading for ongoing and future damages from Kundu's continued actions. Accordingly, legal remedies are inadequate to remedy the violations in this case.

Plaintiff has also demonstrated that the balance of hardships weighs in its favor. The injunction sought by Title Trading would not cause hardship to Kundu, since he has no legitimate rights to the trade secrets and property taken from Title Trading. Kundu can continue to trade and work in any lawful manner with his own assets. Hence, there can be no injury to him at all—and certainly no irreparable injury—if he is simply restrained and enjoined from using Title Trading's assets, particularly when he has been so blatantly and openly acquired in such an illegal manner.

The fourth factor is whether public interest favors injunctive relief. The public has no interest in allowing perpetrators of a trade secret misappropriation to benefit or profit from those acts. Rather, reflecting the public interest, the United States Congress has made the very conduct engaged in by the Defendants subject to criminal prosecution. See Economic Espionage Act, 18 U.S.C. § 1832; National Stolen Property Act, 18 U.S.C. § 2314; see also United States v. Agrawal, 726 F.3d 235, 237 (2d Cir. 2013).

"Courts long have recognized that where the holder of a trade secret imparts it to another in confidence and that other person then appropriates it for his own use, equitable remedies may be invoked to right the wrong." Servo Corp. of America v. General Elec. Co., 337 F.2d 716, 723 (4th Cir. 1964). The Court finds, therefore, that if Kundu is not barred from use of the Title Trading's confidential and proprietary trade secrets, Title Trading will suffer irreparable injury. Kundu has no legitimate rights to the trade secrets and property taken from Title Trading, and thus, he will suffer no injury from a permanent injunction preventing his use of the same.

C. Damages

When a misappropriated trade secret is used in direct competition against the owner of the trade secret, and the profits or losses of the owner are concretely measurable, courts typically calculate damages based on either the plaintiff/owner's lost profits or the defendant/user's illicit gains. 11 A.L.R. 4th 12, p. 91 (2014) (citing Avery Dennison Corp. v. Four Pillars Enterprise Co., 45 Fed. Appx. 479 (6th Cir. 2002)). When, however, the misappropriated secrets are used to save research and development costs or when a plaintiff is unable to prove specific "gains" or "losses," courts measure the value of the secret by other means, specifically including the value as derived by the defendant's savings in research costs. (Id.). For example, in Servo Corp. of America v. General Electric Co., the Fourth Circuit Court of Appeals ruled that it was appropriate to value

damages for the misappropriation of confidential information at the plaintiff's "cost of acquiring the same information by its own experimentation" where an agent of the plaintiff/owner took a confidential design and began using it for its own benefit. 342 F.2d 993, 993 (4th Cir. 1965).

In this case, Plaintiff submits that the proper method for calculating damages is to measure Plaintiff's development costs. It is clear from the undisputed facts that Kundu did misappropriate Title Trading's trade secrets. Title Trading has also presented undisputed evidence that it spent well in excess of $1,000,000 developing the misappropriated trade secrets, which specifically include the amounts paid directly to Kundu for his services in developing the trade secrets. During the term of his employment with Title Trading, Title Trading paid Kundu $686,548 in salary, bonus, and benefits, including subscriptions to specially-acquired software and data for Kundu's use (the "Kundu Development Fees"). The Kundu Development Fees, which Title Trading can value as a sum certain, comprise a portion of Title Trading's overall development costs. Based on the foregoing and applicable law, therefore, the Court finds that it is appropriate to award a judgment to Title Trading against Kundu in the amount of the Kundu Development Fees for damages suffered by Title Trading as of the date of filing the lawsuit.

## IV. CONCLUSION

Under the applicable legal standards, the Court finds that the requested permanent injunction should be issued to Title Trading, that the entry of a permanent injunction against Kundu is appropriate, and that a monetary judgment for damages to Title Trading in the amount of $686,548, the Kundu Development Fees, are appropriate.

**IT IS, THEREFORE, ORDERED** that:

1. For purposes hereof, the following terms shall have the indicated meanings:
    a. The terms "Title Trade Secrets;" "Kundu Generated IP;" "Implementing Software;"

and "Execution Software" shall all have the meanings as set forth and defined in the Complaint, the Elio Declaration, and the SEK Declaration (copies of which are incorporated by reference herein), however embodied.

b. The term "Enjoined Materials" shall mean all of Title Trade Secrets, Kundu Generated IP, Implementing Software, and Execution Software.

c. The term "Affiliates or Confederates" means as to Kundu, all of his heirs, employees, agents, servants, representatives, affiliates, insurers, successors and assigns, and any and all other persons or entities in active concert or participation with any of them who receive actual notice of this Permanent Injunction, whether by personal service, email, fax or otherwise.

2. Kundu and all of his Affiliates and Confederates are hereby **PERMANENTLY ENJOINED AND RESTRAINED** from possessing, retaining, transferring using, copying, disclosing or revealing any of the Enjoined Materials at any time.

3. Judgment is hereby entered in favor of Title Trading and against Kundu in the amount of $686,548.

4. This Final Judgment and Permanent Injunction shall constitute the final judgment in this action as against Kundu.

5. This Court shall retain jurisdiction to enforce this injunction.

6. The Bond previously posted by Title Trading shall be released back to Title Trading.

7. The Clerk of Court is directed to close this case.

Signed: January 4, 2016

Robert J. Conrad, Jr.
United States District Judge